# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 19-788V
Filed: December 11, 2025

```
*  *  *  *  *  *  *  *  *  *  *  *  *    *
TAMI JONES, Trustee for the heirs of     *
Charley Boon, Deceased,                  *
                                         *
                 Petitioner,             *
                                         *
v.                                       *
                                         *
SECRETARY OF HEALTH                      *
AND HUMAN SERVICES,                      *
                                         *
                 Respondent.             *
*  *  *  *  *  *  *  *  *  *  *  *  *    *
```

*Randall Knutson, Esq.*, Knutson & Casey Law Firm, Mankato, MN, for petitioner.
*Tyler King, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

### DECISION ON ATTORNEYS' FEES AND COSTS[1]

On May 29, 2019, Charley Boon ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq*. ("Vaccine Act" or "Program").[2] Petitioner alleged that he suffered from Guillain-Barré syndrome ("GBS") as the result of an influenza ("flu") vaccine he received on September 27, 2016. Petition, ECF No. 1. Petitioner passed away on November 23, 2019. Petitioner's Exhibit ("Pet. Ex.") 49. On October 31, 2024, Tami Jones was substituted as the petitioner, serving as trustee for the heirs of Charley Boon. ECF No. 68.

Petitioner now seeks an award of attorneys' fees and costs, requesting a total of **$4,396.50**, representing **$4,316.50** in fees and **$80.00** in costs. Motion for Fees, ECF No. 73. After careful consideration, petitioner's Motion for Attorneys' Fees and Costs is **GRANTED** for the reasons set forth below.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned finds that the identified material fits within this definition, such material will be redacted from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

# I.    Procedural History

The petition was filed on May 29, 2019, and the matter was assigned to the undersigned the following day. ECF Nos. 1, 4. Between June 14, 2019, and October 1, 2020, petitioner filed medical records, an expert report from Dr. James Dahlgren, accompanying medical literature, and a statement of completion. Pet. Exs. 1-27, ECF Nos. 7-10.

On December 26, 2019, petitioner's counsel filed Mr. Boon's death certificate. ECF No. 18. The following day, petitioner's counsel filed a status report acknowledging Mr. Boon's passing and requesting that his wife be appointed as trustee in furtherance of the claim. ECF No. 19.

Respondent filed his Rule 4(c) Report, recommending against compensation, asserting that while petitioner alleged a GBS injury, the medical records reflected a diagnosis of CIDP, which respondent argued was inconsistent with the claimed vaccine injury. ECF No. 32 at 19-20.

Petitioner filed a supplemental report from Dr. Dahlgren on April 26, 2021. ECF No. 34. Respondent filed an expert report and supporting medical literature from Dr. Jamieson on June 28, 2021. Respondent's Exhibits ("Resp. Ex.") A-B, ECF Nos. 36-39.

On August 2, 2021, petitioner filed a third report from Dr. Dahlgren. Pet. Ex. 64, ECF No. 40. Four months later, respondent filed responsive reports from Dr. Jamieson and Dr. He. Resp. Exs. C-E, ECF Nos. 46-47. Petitioner filed a fourth report from Dr. Dahlgren with medical literature on March 4, 2022. Pet. Exs. 65-72, ECF No. 49.

A status conference was held on April 27, 2022, to discuss the issues in the case. In particular, the shortcomings of Dr. Dahlgren's reports, including but not limited to his failure to address a severe upper respiratory illness suffered by petitioner one month after his flu vaccination, his failure to address *Althen*, and his failure to address petitioner's onset of symptoms being 12-13 weeks after vaccination. Petitioner was then ordered to file a status report advising on next steps. ECF No. 50.

In lieu of a status report, petitioner filed a perfunctory Motion for Ruling on the Record. ECF No. 52.  Following an Order for petitioner to file either a detailed submission or status report by August 22, 2022, petitioner filed a more detailed memorandum in support of the Motion for Ruling on the Record on August 11, 2022. ECF. Nos. 53-54.

Respondent responded to the Motion on October 26, 2022, arguing that the petitioner had failed to provide preponderant evidence that petitioner's flu vaccine caused his alleged injuries. ECF No. 57. Petitioner filed a status report on November 2, 2022, advising that no Reply would be filed. ECF Nos. 57-58.

Petitioner received an interim fee award of $81,747.14 representing $58,099.25 in attorneys' fees and $23,647.89 in costs on August 1, 2024. ECF No. 61.

On October 31, 2024, petitioner filed Patty Boon's death certificate and an order requesting Tami Jones be substituted as trustee for petitioner. Pet. Exs. 73-74, ECF No. 66. Petitioner's motion was granted the same day. ECF No. 68.

A detailed decision denying entitlement issued on June 24, 2025.

Petitioner filed the instant Motion for Attorney's Fees and Costs on August 14, 2025. Motion for Fees, ECF No. 73. Petitioner requests a total of **$4,396.50**, representing **$4,316.50** in attorneys' fees and **$80.00** in costs. ECF No. 73 at 1. Respondent filed a response on August 20, 2025, raising concerns regarding reasonable basis and deferring to the undersigned as to whether the statutory requirements for an award of attorneys' fees and costs were met. ECF No. 74. Petitioner did not file a reply.

The matter is now ripe for a decision.

## II.    Factual Background

### A.  Summary of Relevant Medical Records

Petitioner had an extensive prior medical history: prostate cancer with prostatectomy, skin cancer, appendectomy, lumbar spine fracture at L5, hypertension, hyperlipidemia, seizure disorder with epilepsy, and arteriosclerotic heart disease with angioplasty. Pet. at 1; Pet. Ex. 2; Pet. Ex. 5 at 96. In December of 2014, petitioner fell at work and fractured his hip, requiring surgery. *See* Pet. Ex. 5 at 97-107. Due to growing concerns over his abnormal gait, petitioner visited his primary care physician ("PCP") in June of 2015. He was noted to be "off balance." Pet. Ex. 5 at 94. The PCP also noted that petitioner waddled and shuffled consistent with osteoarthritis from his hip fracture. *Id.* Petitioner's examination was otherwise normal, and the PCP ultimately noted the petitioner was doing well. Petitioner continued to work in the hardware department of Home Depot and walked five to six miles a day. *Id.*

On November 10, 2015, petitioner visited his PCP for a flu vaccine. His wife reported concerns for Parkinson's disease and dementia. Pet. Ex. 5 at 92. The PCP recorded that petitioner did not "shuffle his feet." *Id.* at 91. His wife was told that petitioner did not have dementia, but she was "not convinced." *Id.* Petitioner received the flu vaccine.

Three months later, petitioner's wife called his PCP with concerns that petitioner had worsening dementia and requested a referral. Pet. Ex. 5 at 92.

On September 27, 2016, petitioner received a high dose flu vaccine at a CVS Pharmacy. Pet. Ex. 3. He was 69 years old.

Petitioner began suffering from "severe flu symptoms" on October 24, 2016, and took over the counter medications for three days. Pet. Ex. 2 at 1. Two months later, petitioner experienced numbness in his "hands and feet on both sides." *Id.* at 2.

Petitioner presented to the emergency room on December 31, 2016, reporting bilateral numbness in his hands and fingertips for several days that traveled from his knees to his ankles. Pet. Ex. 5. at 41, 142. Petitioner reported shuffling his feet for two to three years and a fall at work a week prior. Along with reports of extreme anxiety from his wife, he also described an episode of double vision a few days prior, chills, and sweats, but no other flu-like symptoms. *Id.* at 41. Test results were negative, and he was discharged in stable condition and instructed to follow up with his PCP. *Id.* at 44.

On January 4, 2017, petitioner presented to his PCP. Petitioner had fallen that morning and was using a front-wheeled walker for assistance. Pet. Ex. 5 at 86. The PCP noted that petitioner underwent "extensive work-up in the hospital including MRI of the brain." *Id.* He had ataxia.[3] His underlying diseases were noted as epilepsy with seizure disorder, prostate cancer, hip fracture two years ago, arteriosclerotic heart disease with old MI status post angioplasty in 1997, and peripheral neuropathy.[4]

Petitioner was admitted to the hospital on January 10, 2017, with a sudden onset of severe numbness and increasing fatigue in both arms and legs. Pet. Ex. 5 at 87; Pet. Ex. 6 at 2. The differential diagnoses included polyneuropathy and GBS. Pet. Ex. 5 at 91. It was concluded that petitioner had C5 level quadriplegia. Petitioner underwent, "anterior diskectomy and fusion at levels C3-C4 and C4-C5 with anterior plate placed and screws." *Id.* at 87. Following the surgery, petitioner's symptoms noticeably improved. Pet. Ex. 6 at 2, 17-19. His condition worsened the following day, but his numbness was slightly improved. *Id.* at 2. On January 22, 2017, petitioner was discharged to a nursing home. He was diagnosed with memory impairment, anxiety, and C5 level quadriplegia with cervical myelomalacia. *Id.*

Petitioner was examined by a neurologist on February 7, 2017. *See* Pet. Ex. 5 at 64-65. The doctor noted his previous history from January 11, 2017, was consistent with cervical myelopathy at C4-C5 with no findings of transverse myelitis ("TM"), neuromyelitis optica ("NMO"), West Nile virus poliomyelitis, or atypical extremely rapid motor neuron disease. *Id.* His wife reported that his abnormal gait had lasted for "over a year or two, scuffing the toes of his feet." *Id.* at 64. Petitioner was last able to walk and stand in December of 2016. By February 2017, he laid in bed for most of the day and received occasional physical therapy. *Id.* He also suffered from confusion at times. The doctor's impression post-examination was quadriparesis in the setting of cervical myelopathy, present for an estimated two weeks prior to diagnosis, with marked upper motor neuron pattern quadriparesis C4/C5 level, and lower limb sensory disturbance. *Id.* at 65. Although the time course, clinical exam, and diagnostics were consistent with cervical spine dysfunction, the minor improvement following surgery raised concern for a permanent spinal injury related to cord infarction. The doctor also considered if petitioner was experiencing autonomic dysreflexia due to varying blood pressure and bladder dysfunction. Petitioner was ultimately instructed to continue physical therapy. *Id.*

---

[3] Ataxia refers to the "failure of muscular coordination; irregularity of muscular action." *Ataxia*, Dorland's Illustrated Medical Dictionary 168 (33rd ed. 2019) [hereinafter Dorland's].

[4] Peripheral neuropathy, also called polyneuropathy, is "neuropathy of several peripheral nerves simultaneously." *Polyneuropathy*, Dorland's 1468.

Between January 22, 2017, and February 21, 2017, petitioner's weakness in his upper and lower extremities increased. *See* Pet. Ex. 5 at 26, 30. He was readmitted to the hospital on February 21, 2017, for additional testing following his discharge against medical advice on February 14. *Id.* at 26, 30, 140; Pet. Ex. 6 at 294. It was noted that petitioner's strength remarkably improved after surgery, but he had not maintained that improvement and had regressed some. His chief complaints prior to surgery were numbness in his arms and legs which improved after surgery. His weakness in his upper and lower extremities, however, had increased. Pet. Ex. 6 at 294. Petitioner developed neurogenic bladder dysfunction. Pet. Ex. 5 at 26.

At this point, extensive testing had only captured petitioner's cervical spine stenosis causing quadriplegia. Pet. Ex. 6 at 296. After a follow-up with neurology, petitioner's imaging was without fasciculations, respiratory, or bulbar symptoms. *Id.* at 300. Given his time course, prior diagnostics, and trajectory of his neurologic symptoms, no other neurologic conditions were plausible. *Id.* The neurologist was concerned for possible permanent spinal cord injury from prolonged compression or spinal cord infarct but wanted to rule out postoperative seroma or other phlegmon[5]. *Id.* at 300-01. Petitioner's quadriparesis had slightly worsened since his February 7, 2017, examination. However, there was no prior history or diagnostics consistent with NMO, transverse myelitis, or other neurological conditions. As a result, the neurologist felt that empirical IVIG would be worthwhile for a "very atypical multifocal motor neuropathy," despite inconsistency with the history and exam. *Id.* at 301-02. He received three days of IVIG without any change. Petitioner developed a pressure ulcer and was discharged to San Diego Rehabilitation on February 24, 2017. *See id*. at 302, 313.

Petitioner remained at the rehabilitation facility until March 1, 2017. Pet. Ex. 6 at 426; *see also* Pet. Ex. 10 at 2. After neurological re-evaluation, repeat IVIG was planned for two weeks later. Petitioner started prednisone along with Bactrim for a UTI. Due to an insurance change, his stay at the rehabilitation facility was shortened and his PCP and neurologist were changed. Petitioner was discharged home, but it was strongly recommended that he be admitted to another facility for further rehabilitation. *Id.* at 428, 434.

On March 1, 2017, the day of his discharge, petitioner was evaluated by a new PCP. Pet. Ex. 10 at 2. His prior history included partial quadriplegia, abnormal movements of his upper limbs, and shuffling gait for the past two years. *Id.* His wife reported some mild memory issues. His recent history over the past two months noted that he was working 40 hours a week at Home Depot three months ago but was now using a wheelchair. *Id.* On physical examination, he had weakness in all four extremities that was more pronounced in the proximal muscles and on the right side of his body. The PCP was unable to elicit his reflexes, and petitioner had muscle wasting. *Id*. at 3.

Petitioner presented to a new neurologist on March 16, 2017. Pet. Ex. 11 at 2. He was unable to walk, had numbness and tingling in his hands and fingers, and had memory problems. *Id.* The onset of symptoms was reported as around December 28, 2016, when he developed tingling in all limbs over two days while off work. *Id.* He went to the ER on New Year's Day, was admitted for testing, and sent home two days later. *Id.* On January 6, 2017, he presented to his doctor and was unable to stand. During that weekend, he became immobile and was admitted to the hospital.

---

[5] Phlegmon is "acute subcutaneous inflammation, sometimes with abscess." *Phlegmon*, Dorland's 1413.

*Id*. He underwent spinal surgery on January 16 and extensive testing, but it was unclear if the surgery helped. He spent several weeks in rehabilitation. After additional testing was done, he was admitted to the hospital again. *Id*. He had been shuffling his feet for two years before, and his wife showed a video taken in April of 2016 of him sitting, moving the fingers on both hands and questioned if it was a symptom of a neurological condition. He received three days of IVIG in February and regained some physical strength and mental clarity. *Id*. The assessment at this visit was idiopathic peripheral neuropathy. *Id*. at 6. The neurologist wrote that petitioner may have had an episode of GBS, but GBS patients do not need to be retreated unless they show worsening, which typically happens before nadir and petitioner was "well beyond that." *Id*. It was unclear if he could participate in extensive physical rehabilitation. However, he was admitted to rehabilitation from March 21, 2017, through April 15, 2017. He was discharged home in stable condition with a diagnosis of GBS. Pet. Ex. 13 at 1-3.

Petitioner returned to his PCP on April 17, 2017, who noted that he was discharged from acute in-patient rehabilitation due to lack of progression. He reported regaining some strength with improvement to fine motor movement. His goal was to go back to work, but he was tired all the time and did not want to participate in rehabilitation. Pet. Ex. 10 at 6.

In May of 2017, Mrs. Boon informed the neurologist that petitioner was declining and requested additional IVIG treatment. Pet. Ex. 11 at 7. The neurologist asked if petitioner had undergone a spinal tap, which would have shown elevated protein on CSF consistent with GBS/CIDP. Mrs. Boon confirmed that petitioner had not. Petitioner was then admitted to the hospital for five days of IVIG. *Id*.; Pet. Ex. 14 at 1. Upon admission, he exhibited increasing weakness and difficulty swallowing. He slightly improved after five days of IVIG but remained too weak to return home and was transferred to acute rehabilitation. Pet. Ex. 14 at 1-2. The discharge diagnoses included acute exacerbation of underlying GBS, neurogenic bladder, urinary tract infection, and recent left calf deep vein thrombosis. *Id*. at 1.

Petitioner presented to his PCP on June 5, 2017, reporting signs of improvement. He was able to stand from a seated position with assistance, take a few steps with a walker, shower with a chair, and feed himself independently. He received PT at home. Pet. Ex. 10 at 14.

On June 9, 2017, at his follow-up neurology appointment, petitioner reported that it was easier to get in and out of his car since receiving IVIG. Pet. Ex. 11 at 9. His wife reported he only completed tasks if instructed and lacked motivation to improve. Petitioner fell the day before his appointment. He was receiving PT at home three times a week and was supposed to undergo EMG/NCS testing while in rehabilitation, but it was never performed. *Id.* On examination, the neurologist noted slow mentation, but "fairly good power" in his upper and lower extremities. Reflexes were difficult to elicit. Petitioner could stand with assistance and take a few steps with help. *Id*. at 10. He was monitored for recurrent or worsening weakness, which could require an additional five-day course of IVIG. The neurologist stated, "[i]f this happens then I would diagnose him with CIDP." Because petitioner was taking blood thinners, a lumbar puncture was never performed. *Id*. at 11.

Petitioner relapsed and was diagnosed with CIDP on July 28, 2017. His neurologist ordered IVIG every three weeks for six months. Pet. Ex. 15 at 73. In the following months, petitioner's condition declined, and PT was recommended. Pet. Ex. 11 at 15.

Petitioner returned to his neurologist on October 9, 2017, reporting a recent fall that led to an ER visit. He continued to receive IVIG, experienced poor sleep, and lacked motivation to exercise independently. His memory had improved, but the neurologist noted he would likely require life-long assistance. Pet. Ex. 11 at 17. Petitioner was again diagnosed with CIDP with ongoing IVIG as needed. *Id.* at 21.

A ten-month gap followed in the medical records. Petitioner was admitted to the hospital from August 4 to August 20, 2018, for congestive heart failure. He underwent mitral valve replacement, left atrial appendage clipping, and received a coronary artery bypass graft. He was discharged without complication. Pet. Ex. 22 at 1-2, 24-25. He was later hospitalized from September 12 to September 16, 2018, for tachycardia and hypotension. Pet. Ex. 52 at 2159.

On November 14, 2018, Petitioner resumed IVIG treatment, receiving two days of therapy every three weeks for six months. Pet. Ex. 53 at 227.

On April 2, 2019, petitioner was admitted to the hospital for a hip fracture following a fall. Pet. Ex. 53 at 257. He underwent surgical pinning of his right hip and was discharged home on April 5, 2019. *Id.*

Petitioner suffered a CIDP flare on August 22, 2019, and was admitted to the hospital for a five-day course of IVIG. He was discharged to acute rehabilitation on August 27, 2019. Pet. Ex. 53 at 747-48.

On November 15, 2019, petitioner's condition worsened. He was admitted to the hospital unable to stand or lift his arms. He received five days of IVIG treatment without improvement, and a feeding tube was placed. Pet. Ex. 54 at 216-17. His respiratory status deteriorated, and he passed away on November 23, 2019. The causes of death were listed as acute respiratory failure, CIDP, severe malnutrition, severe deconditioning, atrial fibrillation, neurogenic bladder, and anemia. Pet. Ex. 49.

## B. Affidavit of Petitioner, Charley Boon

Petitioner filed an affidavit with his petition, confirming his extensive medical history prior to the flu vaccine on September 27, 2016. Pet. Ex. 1 at 1. He suffered from skin cancer, hip fracture, appendectomy, L5 fracture, hypertension, prostate cancer, prostatectomy, seizure disorder with epilepsy, and arteriosclerotic heart disease status post angioplasty. *Id.*

Petitioner was in his "usual state of health" when he received the flu vaccine. *Id.* On October 24, 2016, twenty-seven days after the vaccine, he began experiencing severe flu symptoms. He took over-the-counter Dayquil Severe and Nyquil for three days. *Id.* By late December 2016, he developed numbness in his hands and feet on both sides and started medical treatment. Petitioner was hospitalized on multiple occasions and was later diagnosed with GBS.

*Id.* at 2. He continued to suffer from symptoms and physical issues due to his GBS diagnosis.  Pet. Ex. 1 at 2. Petitioner alleged that the flu vaccine resulted in his GBS diagnosis. *Id.*

### III.    Legal Standard

#### A.  Good Faith

Good faith is a subjective inquiry. *Hamrick v. Sec'y of Health & Hum. Servs.*, No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007). A petitioner acts in "good faith" if he or she holds an honest belief that a vaccine injury occurred. *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Absent a showing of bad faith, "petitioners are entitled to a presumption of good faith." *Grice v. Sec'y of Health & Hum. Servs.*, 36 Fed. Cl. 114, 121 (1996). Where respondent does not contest good faith, special masters and typically do not address the issue further, and the presumption applies. *See Riley v. Sec'y of Health & Hum. Servs.*, No. 09-276V, 2011 WL 2036976, at *2 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citing *Di Roma*, 1993 WL 496981, at *1); *Turner*, 2007 WL 4410030, at *5.

Here, respondent did not challenge good faith. Petitioner is afforded the presumption of good faith in filing.

#### B.  Reasonable Basis

To establish a reasonable basis, a petitioner must meet the prima facie requirements of § 11(c)(1) of the Vaccine Act with supporting documentation showing that the vaccinee:

(1) received a vaccine listed on the Vaccine Injury Table;
(2) received the vaccination in the United States, or under certain stated circumstances outside of the United States;
(3) sustained (or had significantly aggravated) an injury set forth in the Vaccine Injury Table (42 C.F.R. § 100.3(e)) or that was caused by the vaccine;
(4) experienced the residual effects of the injury for more than six months, died, or required an in-patient hospitalization with surgical intervention; and
(5) has not previously collected an award or settlement of a civil action for damages for the same injury.

*Cottingham*, 971 F.3d at 1345-46.

A petitioner need not demonstrate these elements by a preponderance of the evidence. The standard is somewhere between "a mere scintilla but less than a preponderance of proof." *Id.* A special master's evaluation of reasonable basis focuses on whether the evidence could make a feasible claim for recovery under the Act. *Santacroce v. Sec'y of Health & Hum. Servs.*, No. 15-555V, 2018 WL 405121 at *7 (Fed. Cl. 2018). The Federal Circuit has characterized "more than a mere scintilla" as evidence providing a sufficient basis for a reasonable inference of causation. *Cottingham v. Sec'y of Health & Hum. Servs.*, 154 Fed. Cl. 790, 795 (2021). Absence of an explicit

medical opinion of causation is not dispositive where the medical records themselves support causation. *James-Cornelius on Behalf of E.J. v. Sec'y of Health & Hum. Servs.*, 984 F.3d 1374, 1379-80 (Fed. Cir. 2021).

While incomplete records do not automatically preclude a finding of reasonable basis, an overwhelming lack of objective evidence will not support one. *Chuisano v. Sec'y of Health & Hum. Servs.*, 116 Fed. Cl. 276, 288 (2014); *see Simmons*, 875 F.3d at 634-36 (finding no reasonable basis where records lacked proof of vaccination and diagnosis, and petitioner disappeared for two years before filing). The objective evidence must not be so inconsistent that a feasible claim becomes impossible. *Cottingham*, 154 Fed. Cl. at 795 (citing *Randall v. Sec'y of Health & Hum. Servs.*, No. 18-448V, 2020 WL 7491210, at *12 (Fed. Cl. Spec. Mstr. Nov. 24, 2020)) (finding no reasonable basis where petitioner alleged a left-arm SIRVA, but medical records showed vaccination in the right arm). A claim may also lose reasonable basis if late evidence undermines support for the claim. *See R.K. v. Sec'y of Health & Hum. Servs.*, 760 F. App'x 1010, 1012 (Fed. Cir. 2019) (citing *Perreira v. Sec'y of Health & Hum. Servs.*, 33 F.3d 1375, 1376–77 (Fed. Cir. 1994)). Thus, an earlier finding that a claim has reasonable basis does not preclude a special master from later finding otherwise.

In determining whether a claim has reasonable basis to support it, a special master may consider the totality of the circumstances, including, "the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Hum. Servs.*, 138 Fed. Cl. 282, 289 (2018); *see Cottingham*, 971 F.3d at 1344. Counsel's subjective intent or efforts to gather records cannot substitute for objective evidence. *Cottingham*, 971 F.3d at 135 (noting that attorney conduct does not bear on the reasonable basis analysis). Nor may a petitioner's uncorroborated statements alone constitute objective evidence of reasonable basis, though they may contribute when consistent with contemporaneous medical records. *James-Cornelius*, 984 F.3d at 1380; *see, e.g., Chuisano*, 116 Fed. Cl. at 291; *Foster v. Sec'y of Health & Hum. Servs.*, No. 16-1714V, 2018 WL 774090, at *3 (Fed. Cl. Spec. Mstr. Jan. 2, 2018).

Finally, although the special master possesses broad discretion, that discretion must align with the Vaccine Act's remedial purpose of ensuring petitioners have access to competent legal representation. A special master may not abuse that discretion by denying fees where the evidence objectively supports a feasible claim. *See James-Cornelius*, 984 F.3d at 1381.

## IV.    Analysis of Reasonable Basis

Respondent did not raise any specific objection regarding reasonable basis in this matter but instead deferred to the Court's discretion in determining whether the statutory requirements for an award of attorneys' fees and costs are met. *See* Response at 2. While respondent noted that a claim must rest on more than a mere scintilla of evidence, and that reasonable basis is an objective standard distinct from good faith, respondent did not argue that petitioner's claim lacked a factual or jurisdictional foundation. *Id.* at 2-3.

I find that, based on the contemporaneous medical records and petitioner's corroborating affidavit, reasonable basis existed for filing and maintaining this claim. Mr. Boon's affidavit,

executed on May 28, 2019, attests that he was in his usual state of health at the time of receiving the flu vaccination on September 27, 2016, and that approximately 27 days later her developed severe flu-like symptoms followed by progressive numbness in his hands and feet by the end of December 2016. Pet. Ex. 2 at 2. He reported that these symptoms prompted medical treatment and multiple hospitalizations, ultimately leading to a diagnosis of GBS, which he believed resulted from the flu vaccine. *Id.* at 2. His statements are consistent with the early clinical course documented in the medical records, which reflect onset of bilateral upper- and lower-extremity numbness in December 2016, followed by rapidly progressive weakness necessitating emergency evaluation on December 31, 2016. Pet. Ex. 5 at 41, 142.

Petitioner's medical records corroborate his onset of neurological illness in the weeks following the September 2016 flu vaccine. In January 2017, he was admitted for evaluation of sudden bilateral limb weakness, with a differential diagnosis including polyneuropathy and GBS. Pet. Ex. 5 at 87, 91. Subsequent neurology evaluations documented quadriparesis and areflexia, findings consistent with demyelinating neuropathy. Pet. Ex. 6. at 17-19; Pet. Ex. 11 at 6. Although later records reflected alternative or overlapping diagnosis, such as cervical myelopathy and CIDP, the medical record reflects that Mr. Boon's treating providers considered a possible vaccine-related etiology. His treating neurologists prescribed IVIG, a standard therapy for GBS and CIDP, and contemporaneous notes referenced possible post-infectious or autoimmune neuropathic processes following vaccination. Pet. Ex. 14 at 1-2; Pet. Ex. 15 at 73.

While the evidence was ultimately insufficient to establish entitlement, a finding of reasonable basis requires a burden lower than is required for entitlement. *Cottingham*, 971 F.3d at 1345-46. Rather, the inquiry is whether the record, viewed objectively, contains evidentiary support for the claim's feasibility. Here, the petition was supported by: (1) a detailed affidavit describing temporal onset and progression of neurological symptoms; (2) contemporaneous medical documentation of ascending weakness and numbness in the weeks following vaccination; and (3) repeated diagnostic assessments exploring GBS as a plausible cause. Together, these facts constitute more than a mere scintilla of evidence of a potential vaccine-related injury but were certainly insufficient for a finding of entitlement.

Special masters have underscored the importance of awarding attorneys' fees to encourage the participation of competent legal counsel in the Vaccine Program. As the Special Master stated in *Iannuzzi v. Sec'y of Health & Hum. Servs.*:

> Simply put, the ultimate purpose of Vaccine Act fees and costs awards is *not* to benefit the *attorneys* involved, but to *ensure that Vaccine Act petitioners will have adequate access to competent counsel*. . . . Accordingly, when attorneys spend a reasonable amount of time and costs in representing Vaccine Act petitioners, such attorneys must be fairly compensated for their expenditures, in order to encourage attorneys to participate in future Vaccine Act cases.

No. 02-780V, 2007 WL 1032379, at *11 (Fed. Cl. Spec. Mstr. Mar. 20, 2007), *rev'd in part*, 78 Fed. Cl. 1 (2007); *see also James-Cornelius*, 984 F.3d at 1381 (In exercising her discretion to

award attorneys' fees, the special master must keep in mind the remedial objective of maintaining petitioners' access to willing and qualified legal assistance.).

Further, after all the evidence was filed and while a Motion for Ruling on the Record was pending, petitioner filed a Motion for Interim Attorneys' Fees and Costs in April 2024. ECF No. 59. In response thereto, respondent deferred to the special master to determine whether the petitioner had met the legal standard for an interim fees and costs award, and regarding whether the statutory requirements for an award of attorney's fees and costs were met in this case. ECF No. 60. Respondent did not raise reasonable basis at that time. A Decision awarding attorneys' fees and costs was issued. ECF No. 61. The parties filed a Joint Notice Not to Seek Review of that Decision. ECF No. 63. There has been no substantive change in the evidence since the Motion for Interim Fees was filed, except that my Decision denying Entitlement has issued. But as noted previously, the standard for reasonable basis is substantially lower than that required to find that petitioner is entitled to an award.

For the foregoing reasons, I find that there was reasonable basis for the filing of the petition and throughout the pendency of the matter.

## V.    Attorneys' Fees and Costs Calculation

### A. Reasonable Hourly Rate

A "reasonable hourly rate" is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Avera v. Sec'y of Health & Hum. Servs*, 515 F.3d 1343, 1348 (Fed. Cir. 2008) (citation omitted). In general, this rate is based on "the forum rate for the District of Columbia" rather than "the rate in the geographic area of the practice of petitioner's attorney." *Rodriguez v. Sec'y of Health & Hum. Servs.*, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing *Avera*, 515 F. 3d at 1349). There is a "limited exception" that provides for attorney's fees to be awarded at local hourly rates when "the bulk of the attorney's work is done outside the forum jurisdiction" and "there is a very significant difference" between the local hourly rate and forum hourly rate. *Id.* This is known as the *Davis County* exception. *See Hall v. Sec'y of Health & Hum. Servs.*, 640 F.3d 1351, 1353 (2011) (citing *Davis Cnty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. EPA*, 169 F.3d 755, 758 (D.C. Cir. 1999)).

For cases in which forum rates apply, *McCulloch* provides the framework for determining the appropriate hourly rate range for attorneys' fees based upon the attorneys' experience. *See McCulloch v. Sec'y of Health & Hum. Servs.*, No. 09–293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). The Office of Special Masters has accepted the decision in *McCulloch* and has issued a Fee Schedule for subsequent years.[6]

Here, petitioner requests an hourly rate of $365 for his counsel, Mr. Randy Knutson, for all work performed in this case for the year 2024. Motion for Fees, ECF No. 73. This rate is

---

[6] The OSM Attorneys' Forum Hourly Rate Fee Schedules are available on the U.S. Court of Federal Claims website at https://www.uscfc.uscourts.gov/osm-attorneys-forum-hourly-rate-fee-schedules.The hourly rates contained within the schedules are updated from the decision in *McCulloch v. Sec'y of Health & Hum. Servs.*, No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015).

consistent with what counsel has been awarded previously, and I find it reasonable herein. *See Delory v. Sec'y of Health & Hum. Servs.*, No. 21-1648V, 2025 WL 2793129, at *3 (Fed. Cl. Spec. Mstr. Sept. 2, 2025). Accordingly, the hourly rates are awarded as requested.

Petitioner also requested $140 per hour for all paralegal work performed in 2024. Motion for Fees, ECF No. 73-2 at 4. These rates have also been awarded in previous cases, and so I find them reasonable here. *See, e.g.*, *Delory*, 2025 WL 2793129, at *3.

## B. Hours Reasonably Expended

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary." *Saxton ex rel. Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). "Unreasonably duplicative or excessive billing" includes "an attorney billing for a single task on multiple occasions, multiple attorneys for a single task, attorneys billing excessively for intra office communications, attorneys billing excessive hours, [and] attorneys entering erroneous billing entries." *Raymo v. Sec'y of Health & Hum. Servs.*, 129 Fed. Cl. 691, 703 (2016). While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal or secretary. *See O'Neill v. Sec'y of Health & Hum. Servs.*, No. 08–243V, 2015 WL 2399211, at *9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015). Clerical and secretarial tasks should not be billed at all, regardless of who performs them. *See, e.g.*, *McCulloch*, 2015 WL 5634323, at *26. Hours spent traveling are ordinarily compensated at one-half of the normal hourly attorney rate. *See Scott v. Sec'y of Health & Hum. Servs.*, No. 08–756V, 2014 WL 2885684, at *3 (Fed. Cl. Spec. Mstr. June 5, 2014) (collecting cases). And "it is inappropriate for counsel to bill time for educating themselves about basic aspects of the Vaccine Program." *Matthews v. Sec'y of Health & Hum. Servs.*, No 14–1111V, 2016 WL 2853910, at *2 (Fed. Cl. Spec. Mstr. Apr. 18, 2016). Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Saxton*, 3 F.3d at 1522. In exercising that discretion, special masters may reduce the number of hours submitted by a percentage of the amount charged. *See Broekelschen*, 102 Fed. Cl. at 728–29 (affirming the Special Master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 403, 406 (1997) (same).

The overall hours spent on this matter appear reasonable. *See* Motion for Fees, ECF No. 73-2 at 1-4. I have reviewed the billing entries and find that they adequately describe the work performed and the amount of time spent on that work. None of the entries appear objectionable, nor has respondent identified any entries as objectionable. Accordingly, petitioner is awarded final attorneys' fees of **$4,316.50**.

## C. Reasonable Costs

Like attorneys' fees, a request for reimbursement of attorneys' costs must be reasonable. *Perreira v. Sec'y of Health & Hum. Servs.*, 27 Fed. Cl. 29, 34 (Fed. Cl. 1992).

Petitioner requests a reimbursement of $80.00 in costs. *See* Motion for Fees, ECF No. 73-2 at 5-8. Petitioner represents that this amount reflects the filing fee paid in connection with related probate proceedings in Blue Earth County, Minnesota. *Id.* Such costs "are generally compensable under the Vaccine Act if establishing the estate . . . is 'an essential prerequisite condition' to obtaining an award that must 'be fulfilled in order for [the] award to be made.'" *Bennett v. Sec'y of Health & Hum. Servs.*, No. 15-65V, 2017 WL 3816094, at *3 (Fed. Cl. Spec. Mstr. Aug. 7, 2017) (quoting *Haber v. Sec'y of the Dep't of Health & Hum. Servs.*, No. 09-458 V, 2011 WL 839111, at *2 (Fed. Cl. Spec. Mstr. Feb. 14, 2011)). Such was the case here, where petitioner passed away during the pendency of this case, as did his wife, who was the administrator of his estate. The undersigned finds the costs adequately documented and reasonable considering the circumstances of the case. Accordingly, petitioner is awarded **$80.00** in costs.

## VI.    Conclusion

Based on the foregoing, petitioner's Motion for Attorneys' Fees and Costs is **GRANTED.** Petitioner is hereby awarded a total of **$4,396.50,** representing **$4,316.50** in attorneys' fees and **$80.00** in costs, to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement. The clerk shall enter judgment accordingly.[7]

**IT IS SO ORDERED.**

**s/ Mindy Michaels Roth**
Mindy Michaels Roth
Special Master

---

[7] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.